# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|   |   |
|---|---|
| LEVEL HEATING AND AIR CONDITIONING COMPANY, *et al.*, | * |
| Plaintiffs, | * |
| v. | * |
|   | *  Case No. DLB-20-3154 |
| PATRIOT CONSTRUCTION, LLC, *et al.*, | * |
| Defendants. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

In this contractual dispute, plaintiffs Level Heating and Air Conditioning Company ("Level") and Upper Bay Mechanical, Inc. ("Upper Bay"), both subcontractors, claim that defendant Patriot Construction, LLC ("Patriot"), a primary contractor on a federal construction project, improperly terminated three subcontracts resulting in $666,000.00 in lost profits. Plaintiffs' complaint includes three breach of contract counts against Patriot, one for each contract, and one count for an alleged violation of the Miller Act, 40 U.S.C. § 3133, against Hartford Casualty Insurance Company ("Hartford"), Patriot's surety on the project. Defendants have moved to dismiss plaintiffs' complaint in its entirety for failure to state a claim and for lack of jurisdiction. ECF 7, 7-1. The motion has been fully briefed. ECF 11 & 12. A hearing is not necessary. *See* Loc. R. 105.6. The motion to dismiss is granted.

I.   Background[1]

Level and Upper Bay are Maryland corporations that provide plumbing and HVAC services. ECF 1, ¶¶ 1–2. The two companies have the same owners. *Id.* ¶ 2. Patriot is a limited liability company that provides general construction services to the federal government. *Id.* ¶ 3. Patriot was the primary contractor for all relevant construction work on a federal construction project at Aberdeen Proving Ground ("the Project"). *Id.* ¶ 56. Hartford was the surety on the Project and posted a payment bond of $1,000,000.00 for the Project. *Id.* ¶ 57.

Between January and July 2019, Patriot executed three subcontracts with Level and Upper Bay for work on various buildings at the Project. Patriot and Level contracted for Level's installation of HVAC, plumbing, and ductwork on Building 310 (the "310 Contract"). *Id.* ¶ 9. The 310 Contract price, after an immediately executed change order, was set for $840,000.00, of which "$330,000.00 was profit to Level." *Id.* ¶ 10. Patriot and Upper Bay contracted for Upper Bay's installation of ductwork and exhaust fans on Building 4118 ("the 4118 Contract"). *Id.* ¶ 12. The 4118 Contract price was set for $52,355.00, of which "$21,000.00 was profit to Upper Bay." *Id.* ¶ 13. Patriot and Upper Bay entered into a second contract for Upper Bay's installation of HVAC, plumbing, and fire alarm systems on Building 4220 ("the 4220 Contract," and collectively with the 310 Contract and the 4118 Contract, "the Contracts"). *Id.* ¶ 15. The 4220 Contract price was set for $1,266,879.00, of which "$315,000.00 was profit to Upper Bay." *Id.* ¶ 16.

The Contracts contain near-identical termination clauses. *Id.* ¶¶ 11, 14, 17. The 310 Contract termination clause states:

> If SUBCONTRACTOR at any time refuses or neglects to supply sufficient, properly skilled workers, or materials or equipment of the proper quality and

---

[1] As is proper on a motion to dismiss, the Court takes all well-pleaded allegations contained in the complaint as true. At least for the purpose of their motion to dismiss, defendants do not dispute the facts set forth in the Background. *See* ECF 7-1.

quantity, or fails in any respect to prosecute the Work with promptness and diligence or to maintain the schedule of Work, or causes by any action or omission the stoppage or interference of Work of PATRIOT or any other subcontractor or fails in the performance of any of the covenants contained in this Agreement, or be unable to meet its debts as they mature, PATRIOT may at its option and at any time after serving three calendar days' notice of such default, terminate this Agreement by delivering written notice of termination to SUBCONTRACTOR.  Thereafter, PATRIOT may take possession of the plant and Work, materials, tools, appliances, and equipment of SUBCONTRACTOR at the building site, and through itself or others provide labor, equipment and materials to prosecute SUBCONTRACTOR's Work on such terms and conditions as shall be deemed necessary, and shall deduct the cost thereof, including all charges, expenses, losses, costs, damages and attorneys' fees incurred as a result of SUBCONTRACTOR's failure to perform from any money due or thereafter to become due to SUBCONTRACTOR.  If PATRIOT so terminates this Agreement, SUBCONTRACTOR shall not be entitled to any further payment under this Agreement until SUBCONTRACTOR's Work has been completed and accepted by OWNER and payment has been received by PATRIOT from OWNER with respect thereto.

In the event that the unpaid balance due exceeds PATRIOT's cost of completion, the difference shall be paid to the SUBCONTRACTOR; but if such expense exceeds the balance due, SUBCONTRACTOR agrees to promptly pay the difference to PATRIOT.

PATRIOT shall have the right to terminate this Agreement, by written notice, without SUBCONTRACTOR being in default for any cause or for its own or OWNER's convenience, and require SUBCONTRACTOR to immediately stop Work.  In such event, PATRIOT shall pay SUBCONTRACTOR for that Work actually performed in an amount proportionate to the sum payable under this Agreement after payment is received by PATRIOT from OWNER.  PATRIOT shall not be liable to SUBCONTRACTOR for any other costs, speculative damages, or for any prospective profits on Work not performed.

*Id.* ¶ 11.[2]

Level and Upper Bay "began work on each project shortly after the execution of their respective contracts," *id.* ¶ 18, and "last performed work on the Project[] on or after November 1,

---

[2] The termination clause of the 310 Contract, ECF 1, ¶ 11, is identical to the termination clause of the 4220 Contract, *id.* ¶ 17.  The termination clause of the 4118 Contract is identical in substance to the other two contracts but refers to Patriot as Patriot Construction and, at least as reproduced in the complaint, contains three inconsequential typos.  *Id.* ¶ 14.

3

2019." *Id.* ¶ 61.  On or around January 23, 2020, "the owner ordered Patriot to halt work, who then ordered that Plaintiffs halt work on the Project[]." *Id.* ¶ 19.[3]

On or around May 2, 2020, "Patriot emailed Plaintiffs and attempted to terminate the Contracts." *Id.* ¶ 24.  Level and Upper Bay allege that "[a]t no time prior to Patriot's purported termination of the Contracts had [Patriot] provided notice of default to Plaintiffs and afforded Plaintiffs an opportunity to cure." *Id.* ¶ 25.

In June 2020, the owner and Patriot recommenced work on the Project.  *Id.* ¶ 20.  Plaintiffs were not asked to recommence their work under the Contracts at any time following the stop work order or the recommencement of work.  *Id.* ¶ 21.  Plaintiffs learned that Patriot had hired other subcontractors to complete the work originally specified in the 310 and 4220 Contracts.  *Id.* ¶¶ 22–23.

Plaintiffs allege the "termination of the Contracts for-cause by Patriot was wrongful and in violation of the terms of each of the respective Contracts." *Id.* ¶ 26.  Plaintiffs claim that Patriot materially breached the Contracts when it "wrongfully purported to terminate" the Contracts by failing to provide "at least three calendar days' notice of any alleged default" and failing to provide an opportunity "to cure any such alleged default." *Id.* ¶ 31 (the 310 Contract), ¶ 40 (the 4118 Contract), ¶ 49 (the 4220 Contract).  As a result of these alleged breaches, Level and Upper Bay claim entitlement "to the value of the profits lost pursuant to the Contracts." *Id.* ¶ 26.  They allege the total amount of lost profits for all three contracts is $660,000.00.  *Id.* ¶ 62.[4]

---

[3] It appears that "owner" refers to the U.S. Army Corps of Engineers, the federal entity that contracted with Patriot.  *See* ECF ¶ 56.

[4] The total price for all three subcontracts was $2,156,000.00.  As of the filing of the complaint, Patriot had paid plaintiffs a combined total of $130,000.00 under the contracts.  In this lawsuit, plaintiffs seek only the portion of the contract price that they claim constitutes "lost profits." *See* ECF ¶¶ 62–63.

Level and Upper Bay allege Hartford, as Patriot's surety, is liable under the Miller Act for the lost profits because more than 90 days have passed since plaintiffs sent Patriot an invoice for $666,000.000 and no payment has been made. *Id.* ¶¶ 63–65.

On October 29, 2020, plaintiffs filed their complaint against Patriot and Hartford. This motion to dismiss followed.

II.     Analysis

   A.  Jurisdiction

The Court has original jurisdiction over plaintiffs' Miller Act claim under 40 U.S.C. § 3133 and 28 U.S.C. § 1331. The Court has supplemental jurisdiction over plaintiffs' breach of contract claims under 28 U.S.C. § 1367(a). Should the Court dismiss the Miller Act claim, 28 U.S.C. § 1367(c) provides the Court with "wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) (other citation omitted). Relevant factors include "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Id.* (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

Ordinarily, the Court would first decide whether the federal claim survives a motion to dismiss and then decide whether to exercise supplemental jurisdiction over any remaining state claims. Here, however, the Miller Act claim and the contract claims are based on the same set of facts, and the legal viability of the former turns on the legal viability of the latter. In other words, if the contract claims fail, the Miller Act claim fails too. Thus, for the sake of judicial economy, the Court exercises jurisdiction over all claims to decide the motion to dismiss. The Court first determines the legal sufficiency of the contract claims and then addresses the Miller Act claim.

B.  Rule 12(b)(6) Motion

Under Rule 8, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2)).  A Rule 12(b)(6) motion to dismiss for failure to state a claim "tests the legal sufficiency of a complaint." *In re Birmingham*, 846 F.3d 88, 92 (4th Cir.), *as amended* (Jan. 20, 2017) (citing *Papasan v. Allain*, 478 U.S. 265, 283 (1986)); *see* Fed. R. Civ. P. 12(b)(6).

To survive a motion to dismiss, a complaint must state "a plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged . . . [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.

*Id.* at 678; *see also Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (The Court need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001))).  "[F]actual allegations must be enough to raise a right to relief above a speculative level." *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 472–73 (D. Md. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

When resolving a motion to dismiss, the Court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).  Rather, the Court "accept[s] as true all of the factual allegations contained in the complaint and draw[s] all reasonable inferences in favor of the plaintiff." *Id.* (quoting *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)).

1. Breach of Contract

The parties agree that Maryland law governs the Contracts. ECF 1-1, at 10; ECF 1-2, at 9; ECF 1-3, at 8. The Court will, therefore, follow the objective law of contract interpretation. *See Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 546 (Md. 2003). "When the clear language of a contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used." *Id.*; *see also Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232 (Md. 2013). The Court must determine from the unambiguous contract language "what a reasonable person in the position of the parties would have thought the contract meant." *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005) (citing *Turner v. Turner*, 809 A.2d 18, 49 (Md. Ct. Spec. App. 2002) (internal quotation marks omitted)).

> [C]ontracts must be interpreted in their entirety and . . . "if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed."

*Harig v. Progress Rail Servs. Corp.*, 166 F. Supp. 3d 542, 549 (D. Md. 2015) (quoting *Dumbarton Improvement Ass'n*, 73 A.3d at 233). "The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law." *Sy-Lene*, 829 A.2d at 544.

To state a claim for breach of contract, Level and Upper Bay must allege that "the defendant owed [them] a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001). Plaintiffs claim that Patriot breached the Contracts by terminating them for cause without first giving plaintiffs three days' written notice. ECF 1, ¶ 25. Patriot argues it could terminate the Contracts for any reason without prior written notice. ECF 7–1. The Court agrees with Patriot.

The Contracts provide that Patriot may "terminate th[e] Agreement, by written notice, without SUBCONTRACTOR being in default for any cause or for its own or OWNER's convenience." ECF 1, ¶¶ 11, 14, 17. This unambiguous language permitted Patriot to terminate the Contracts "by written notice . . . for any cause or for [Patriot's] . . . convenience." According to the complaint, Patriot did just that: Patriot notified Level and Upper Bay by email that it terminated the Contracts. ECF 1, ¶ 24. The Contracts required no more.[5]

Level and Upper Bay claim the following contract language required Patriot to give them three days' written notice and an opportunity to cure:

> If SUBCONTRACTOR at any time refuses or neglects to supply sufficient, properly skilled workers, or materials or equipment of the proper quality and quantity, or fails in any respect to prosecute the Work with promptness and diligence or to maintain the schedule of Work, or causes by any action or omission the stoppage or interference of Work of PATRIOT or any other subcontractor or fails in the performance of any of the covenants contained in this Agreement, or be unable to meet its debts as they mature, PATRIOT may at its option and at any time after serving three calendar days' notice of such default, terminate this Agreement by delivering written notice of termination to SUBCONTRACTOR. Thereafter, PATRIOT may take possession of the plant and Work, materials, tools, appliances, and equipment of SUBCONTRACTOR at the building site, and through itself or others provide labor, equipment and materials to prosecute SUBCONTRACTOR's Work on such terms and conditions as shall be deemed necessary, and shall deduct the cost thereof, including all charges, expenses, losses, costs, damages and attorneys' fees incurred as a result of SUBCONTRACTOR's failure to perform from any money due or thereafter to become due to SUBCONTRACTOR. If PATRIOT so terminates this Agreement, SUBCONTRACTOR shall not be entitled to any further payment under this Agreement until SUBCONTRACTOR's Work has been completed and accepted by OWNER and payment has been received by PATRIOT from OWNER with respect thereto.

---

[5] Plaintiffs claim Patriot purported to terminate the Contracts for cause and suggest that Patriot's motive for termination is a question of fact that precludes resolution as a matter of law. ECF 1, ¶ 26; ECF 11, at 6. Not so. Patriot's motivation for terminating the Contracts is irrelevant. The Contracts allowed Patriot to terminate "for any cause" or for its own "convenience." The agreements do not require Patriot to have or give a reason for termination.

ECF 1, ¶ 11.[6]  This provision does not apply to the facts alleged in the complaint.  By its plain and unambiguous terms, the provision provides additional recourse *to Patriot* if Level or Upper Bay fails in any respect to perform its contracted-for work.  If the subcontractor fails to perform, "PATRIOT may at its option and at any time after serving three calendar days' notice of such default, terminate th[e] Agreement by delivering written notice of termination to SUBCONTRACTOR."  *Id*.  After doing so, Patriot may step in, seize the subcontractor's materials and equipment, arrange for the work to be completed by another, and deduct costs "incurred as a result of SUBCONTRACTOR's failure to perform from any money due or thereafter to become due to SUBCONTRACTOR."  *Id*.  The provision gives the *subcontractor* no specific rights beyond receiving three days' written notice before its equipment and materials are seized to finish the defaulted job.  Level and Upper Bay do not allege their equipment or materials were ever seized.  Nor do they allege Patriot terminated the Contracts because they failed to perform.  Thus, the language in the Contracts requiring three days' notice of default prior to termination does not apply to the allegations in this case.  Plaintiffs have failed to plead plausible breach of contract claims.

Plaintiffs' contract claims are legally insufficient for another reason.  Upon termination, the Contracts required Patriot to pay plaintiffs "for that Work actually performed in an amount proportionate to the sum payable under this Agreement."  ECF 1, ¶ 11.  Plaintiffs do not allege they have not been paid for work "actually performed."  Rather, they seek lost profits for work they did not perform. ECF 1, ¶¶ 32–35, 41–44, 50–53.  Such profits are expressly excluded under the Contracts, which state Patriot "shall not be liable to SUBCONTRACTOR for any other costs, speculative damages, or for any prospective profits on Work not performed."  *Id. ¶* 11.

---

[6] Under no contractual provision is Patriot required to provide Level or Upper Bay an "opportunity to cure" a performance failure before termination.  *See* ECF 1, ¶¶ 11, 14, 17.  Failure to provide such an opportunity cannot give rise to a plausible breach of contract claim.

9

Because plaintiffs have failed to plausibly plead a breach of contract claim, the claims against Patriot are dismissed.

2. Miller Act

Plaintiffs have asserted a Miller Act claim against Hartford, Patriot's surety on the Project, for the lost profits they allegedly suffered because of the contract termination. The Miller Act authorizes any "person that has furnished labor or material in carrying out work" under a Miller Act contract and who "has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made" to bring "a civil action on the payment bond for the amount unpaid" at that time. 40 U.S.C. § 3133(b)(1); *see also United States v. Berkley Reg'l Ins. Co.*, 986 F. Supp. 2d 660, 661 (D. Md. 2013). Its purpose is to "protect[] those who furnish labor or material for substantial federal public works contracts" by "provid[ing] laborers and materialmen on federal projects with a substitute for the common law materialman's lien and its relatives, which can't attach to federal property." *United States ex rel. Glob. Bldg. Supply, Inc. v. WNH Ltd. P'ship*, 995 F.2d 515, 517–18 (4th Cir. 1993) (citing *J.W. Bateson Co. v. United States ex rel. Bd. of Trs.*, 434 U.S. 586, 589 (1978)). "The essence of its policy is to provide a surety who, by force of the Act, must make good the obligations of a defaulting contractor to his suppliers of labor and material." *United States ex rel. Sherman v. Carter*, 353 U.S. 210, 216–17 (1957). The Miller Act is "entitled to a liberal construction . . . [b]ut such a salutary policy does not justify ignoring plain words of limitation and imposing wholesale liability on payment bonds.'" *Id.* at 216 (quoting *Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.*, 322 U.S. 102, 107 (1944)).

Generally, "[a] surety's liability under the Miller Act is measured by the general contractor's liability under the construction contract." *Consol. Elec. & Mechanicals, Inc. v. Biggs*

10

*Gen. Contracting, Inc.*, 167 F.3d 432, 435 (8th Cir. 1999); *see also Carter*, 353 U.S. at 216–17. Level and Upper Bay concede that "Patriot's surety cannot be obligated to pay sums that Patriot is not obligated to pay." ECF 11, at 8. As discussed above, plaintiffs failed to state a claim for breach of contract against Patriot. Without a breach, Patriot is not a "defaulting contractor" whose obligations Hartford must make good. *See Carter*, 353 U.S. at 216–17. Thus, plaintiffs fail to state a Miller Act claim against Hartford.

Even if plaintiffs had pled a plausible contract claim against Patriot, the Miller Act claim would not survive the motion because the damages they seek are unrecoverable. Under the Act, a plaintiff may recover from the surety if the plaintiff "has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made." 40 U.S.C. § 3133(b). By the Act's plain language, a claim must be for labor "performed." *See United States ex rel. Walton Tech., Inc. v. Weststar Eng'g, Inc.*, 290 F.3d 1199, 1205 (9th Cir. 2002) ("by the express terms of the Miller Act a subcontractor's right of recovery . . . is conditioned on the passage of time *from completion of work* or provision of materials") (emphasis added). As noted earlier, plaintiffs do not seek compensation for work performed. They seek lost profits on work never performed. ECF 1, ¶¶ 32–35, 41–44, 50–53.

Level and Upper Bay argue that *United States ex rel. Woodington Electric Co. v. United Pacific Insurance Co.*, 545 F.2d 1381 (4th Cir. 1976), supports their position that they may recover lost profits from a surety under the Miller Act. The Court is unpersuaded. The contract at issue in *Woodington* compensated the subcontractor based on a percentage of the overall project's profits, and the subcontractor fully performed the work. *Id.* at 1382. Under those facts, the Court held that a "surety is obligated to pay the compensation to which the parties have agreed, although this amount exceeds the cost of labor, materials, and overhead." *Id.* at 1383. Here, the facts are

materially different. Plaintiffs' compensation under the Contracts was for a fixed amount. It was not based on a share of the Project's overall profits, and the Contracts did not guarantee compensation for lost profits. And here, unlike in *Woodington*, plaintiffs did not perform all of the contracted-for work because Patriot exercised its right to terminate the Contracts before completion. Notably, Level and Upper Bay do not allege that they were not paid in full for work they actually performed. Thus, *Woodington* does not apply to the facts of this case. *See Berkley Reg'l Ins. Co.,* 986 F. Supp. 2d at 665 (citing *Woodington*, 545 F.2d at 1383) (describing two lines of Miller Act cases: the first, "when a prime contractor breaches or terminates a subcontract, the subcontractor cannot recover expectation damages from the Miller Act surety," and the second, as in *Woodington*, "when a subcontractor fully performs its contractual obligations, but the prime contractor fails or refuses to pay the subcontractor for its work . . . [in which case] the surety is obligated to pay the compensation to which the parties have agreed"); *see also United States ex rel. Kitchens To Go v. John C. Grimberg Co.,* 283 F. Supp. 3d 476, 485 (E.D. Va. 2017) (characterizing *Woodington* as holding only that when "an amount due under the Miller Act is 'determined by reference to the subcontract,' a subcontractor's compensation in a Miller Act case can be measured by a share of profits, rather than in terms of costs of labor and material"); *United States ex rel. Acoustical Concepts, Inc. v. Travelers Cas. & Sur. Co.*, 635 F. Supp. 2d 434, 439 (E.D. Va. 2009) ("Read carefully, *Woodington* stands, at most, for the proposition that, in a Miller

Act case, reference to the subcontract must be made to define the manner of payment in order to determine sums due to the subcontractor for providing labor and materials.").[7]

In an apparent effort to avoid dismissal of their claim, Level and Upper Bay argue that they sufficiently plead a Miller Act claim for recovery of more than lost profits, relying on their allegation that "Patriot has breached the Contracts by failing to pay Plaintiffs for all amounts due and owing to Plaintiffs under the Contracts for work performed and labor supplied for the projects." ECF 11, at 8; ECF 1, ¶ 60. This single conclusory allegation is at odds with the specific allegations in the complaint. Plaintiffs do not identify any specific work they performed or labor they supplied for which they were not compensated. Instead, they repeatedly make clear they seek lost profits. *E.g.*, ECF 1, ¶ 26 (termination of the Contracts "entitl[es] Plaintiffs to the value of the profits lost"); *id.* ¶¶ 33, 35 (concerning the 310 Contract, "Patriot has paid $30,000.00 leaving a balance of $330,000.00 in lost profit…[t]he value of the compensatory damages incurred by Level is $330,000.00"); *id.* ¶¶ 42, 44 ("Patriot has not paid any portion of the $52,000.00 original contract price leaving a balance of $21,000.00 in lost profit…[t]he value of the compensatory damages incurred by Upper Bay is $21,000.00"); *id.* ¶¶ 51, 53 ("Patriot has paid $100,000.00 leaving a balance of $315,000.00 in lost profit…[t]he value of the compensatory damages incurred by Upper Bay is $315,000.00"); *id.* ¶¶ 62–63 ("Patriot has paid Plaintiffs $130,000.00 of [the total contract price of $2,156,000.00], leaving a balance in the amount of $666,000.00 in lost profits. Plaintiffs have demanded the sum of $666,000.00 from Patriot."). Given their repeated claim of entitlement

---

[7] While the Fourth Circuit has yet to decide whether lost profits are recoverable under the Miller Act, the majority of other circuits who have confronted this question have held they are not. *See Consol. Elec. & Mechanicals, Inc.*, 167 F.3d at 436; *Mai Steel Serv., Inc. v. Blake Constr. Co.*, 981 F.2d 414, 418 (9th Cir. 1992); *United States ex rel. T.M.S. Mech. Contractors, Inc. v. Millers Mut. Fire Ins. Co.*, 942 F.2d 946, 952–53 (5th Cir. 1991); *United States ex rel. Pertun Constr. Co. v. Harvesters Grp., Inc.*, 918 F.2d 915, 919 (11th Cir. 1990). *But see Hensel Phelps Constr. Co. v. United States*, 413 F.2d 701, 704 (10th Cir. 1969).

only to lost profits and no specific claim for compensation for work performed or material supplied, plaintiffs have not alleged a plausible Miller Act claim against Hartford.

The Miller Act claim is dismissed.

C.  Leave to Amend

Level and Upper Bay suggest that, if their claims are found deficient, the Court should grant them leave to amend.  ECF 11, at 3.  Pursuant to Rule 15, courts "should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "A motion to amend should only be denied when 'the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.'"  *ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 917 F.3d 206, 217–18 (4th Cir. 2019) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999)); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962).

Amendment of the complaint would be futile.  The Contracts expressly allow for termination by Patriot "for any cause or for its own . . . convenience."  ECF 1, ¶¶ 11, 14, 17.  The Contracts expressly disallow recovery of lost profits.  *Id.*  Level and Upper Bay cannot plead around the plain language of the Contracts into which they freely entered.  Plaintiffs' request for leave to amend the complaint is denied.

**ORDER**

For the reasons stated in this Memorandum Opinion and Order, it is, this <u>6th</u> day of December, 2021, hereby ORDERED:

1. Defendants' motion to dismiss plaintiffs' complaint, ECF 7, IS GRANTED;

2. Plaintiffs' complaint IS DISMISSED with prejudice; and

3. The Clerk SHALL CLOSE this case.

                                                       Deborah L. Boardman
                                                       United States District Judge